Yeskoo Hogan & Tamlyn, LLP
535 Fifth Avenue
New York, NY 10017
212-983-0900
Attorneys for SSP Capital Partners, LLC
By:  Richard C. Yeskoo

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SSP CAPITAL PARTNERS, LLC,                                      1:07-cv-03878 (NRB)

                                         Plaintiff,

              – against –

MANDALA, LLC, HAROUST, LLC, HAMILTON
GRANGE, LLC, ARABARA, LLC and 316
SECOND AVENUE, LLC,

                                         Defendants.
-----------------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

       Plaintiff SSP Capital Partners, LLC ("SSP") submits this memorandum in

support of its motion for summary judgment against defendants.

### Statement of Facts

       This is an action against several New York real estate holding companies

owned and managed by H. Derderian ("Derderian").  As of February 22, 2007 at

least three properties were in foreclosure and Derderian needed to raise money

to save the properties.  One property, 72-84 East 111th Street, was in the process

of being sold, but the closing date was uncertain.

1

On February 22, 2007, Derderian, on behalf of the defendant holding companies, entered into a loan commitment agreement with plaintiff SSP for a loan of $2,200,000. The letter agreement is annexed to the Gordon Affidavit as Exhibit 2.

The first sentence of the commitment letter states that we (SSP Capital Partners, LLC) have "agreed to make a loan secured by" collateral listed in Exhibit A.  The $2,200,000 loan had a term of one year (with no prepayment penalty), an interest rate 14% or 5 ¾ over prime (whichever greater) and a loan origination fee of $132,000.  Id.  SSP had two days after the receipt of all due diligence materials to decide whether to proceed with the loan.  Id.

The letter was sent by email from one of SSP's partners, Michael Gordon, to Derderian.  Consequently, the letter itself was not signed by Gordon. However, the letter itself indicates that it was to be binding on both parties if signed and returned by borrowers.  The last paragraph of the letter states:

> Please indicate your acceptance of this Commitment by signing below and returning this letter…  If we have not received your signed acceptance and deposit check by 5pm on February 23, 2007, time being of the essence, this commitment shall expire and be of no force and effect.

Id. p.5.  The letter required a $10,000 deposit from borrower, which was paid, and stated with respect to such deposit:

> [I]n the event Borrower fails to close as required by this Commitment after acceptance of the Commitment by Borrower, this deposit shall be forfeited to Lender.  Such forfeiture shall not limit Lender's remedies in the event of Borrower's default hereunder.

Id. p.3.

2

The defendants signed the commitment letter and faxed it back to plaintiff. Plaintiff obtained title reports on all the properties and conducted due diligence on the properties. At the same time, plaintiff's counsel prepared the legal documentation for the transaction and forwarded it to Mr. Derderian's lawyer, Richard Kaplin. A little over two weeks after the commitment letter had been signed, on March 6, 2007, SSP sent a list of items to defendants' counsel that needed to be completed prior to closing. Gordon Aff. Ex. 4. A significant task was to secure the agreement of the senior lenders, who were foreclosing on the properties which would be used as collateral, to accept payment on the defaulted loans and to reinstate the loans. Gordon Aff. ¶ 8.

However, defendants did not make any good faith efforts to proceed to the closing. At the instruction of Derderian, defendants' counsel did nothing. He did not review the draft closing documents. He explained at his deposition that Derderian was looking for another transaction with better terms and subsequently decided to go with another transaction. He testified as follows:

> Q.    Do you know why the loan from SSP Capital Partners did not close?
>
> A.    I know that Mr. Derderian, at that point of time, was shopping for a variety of different loans. He viewed the loan from SSP that was being proposed to him as a very expensive loan, very high rate of interest, very high cost and he was at that point in time shopping around for financing. This was one of the potential choices that he had.

Yeskoo Aff. Exh. 1.

Derderian tried to renegotiate the terms of the loan commitment on March 7, 2007. SSP agreed to some of the changes proposed but not all of them.

Gordon Aff. Exh. 5.  On March 8, 2008, after a conversation with Gordon's partner, Derderian told SSP he would think about the situation overnight and tell SSP what whether he would close.  Gordon Aff. Exh. 6.  On March 9, 2007 SSP sent Derderian and his counsel a formal letter stating that it was ready to close provided defendants cooperated in providing the remaining materials needed to close.  Gordon Aff. Exh. 7.  Derderian did not respond to this letter.  Gordon Aff. ¶ 11.   On March 14, 2007 Gordon called Derderian to ask him if he was going to close.  He said no.  Gordon Aff. ¶ 12; Gordon Aff. Exh. 8.

SSP suffered two categories of damages as a result of defendants' breach of the agreement.  The first was it was not paid the loan origination fee.  The loan origination fee, set forth on the first page if the commitment letter, was $132,000. Gordon Aff. Exh. 2.

The second category of damages which plaintiff suffered was its lost profits on the loan.  The loan term was for one year.  The amount of the loan was $2,200,000.  Defendants would have almost immediately repaid $1,200,000 to secure the release of 72-84 East 111th Street property, which was sold on March 16, 2007.[1]  Therefore, plaintiff would be entitled to its lost profits on $1,000,000 for the loan term of one year.  Gordon Aff. ¶ 14.

Plaintiff would have funded the loan from the money in its money market accounts which at this time were yielding 4% or less.  Gordon Aff. ¶ 15.   The interest rate on the loan was 14.5% or 5 3/4% over prime, whichever was greater.  To simplify calculation of damages, plaintiff is asking for the 14.5%

---

[1] The loan commitment stated "Borrower shall be entitled to a release of the mortgage given hereunder with respect to 72-84 East 11th [sic] Street upon the making of a principal payment of $1,200,000 …"  Gordon Aff. Exh. 2  p.3.

interest rate.   Plaintiff is entitled to $105,000 (the difference between 14.5% and 4% times $1,000,000 times 1 year) as its damages for lost profits. Id.

Plaintiff was unable to cover to mitigate its damages.  Plaintiff's problem was not lack of money -- it had over two million dollars in the bank and access by borrowing to millions more.  Rather, plaintiff's problem was deal flow, in that no suitable replacement deal was located in the next year. Id. ¶ 16.

## ARGUMENT

### PLAINTIFF HAS PROVED A PRIMA FACIE
### CASE FOR BREACH OF CONTRACT

To prove a prima facie case for breach of contract, the plaintiff must establish:  (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. National Market Share, Inc. v. Sterling National Bank, 392 F.3d 520, 525 (2d Cir. 2004); Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004).

A.    The Loan Commitment Letter
      Is A Valid Bilateral Contract

A loan commitment letter can be either a unilateral or bilateral contract depending on whether it is solely a promise to lend by a lender or also a promise to borrow by a borrower. Lincoln National Life Insurance Co. v. NCR Corp., 603 F.Supp. 1393, 1400 (D.Ind. 1984). aff'd. 772 F.2d 315 (7th Cir. 1985).  "It is the language embodied in the instrument which controls and the parties' intention must be gleaned through application of basic tenets of contract law." Id. at 1401. If the language of the contract is unambiguous, the parol evidence rule applies

and external evidence as to the meaning is not admissible.  <u>Albany Savings</u>

<u>Bank, FSB v. Halpin</u>, 117 F.3d 669 (2d Cir. 1997).

 Applying these general principles to the contract at issue in this case

shows that it is a valid bilateral contract binding on both the lender and

borrowers.  First, defendants' argument that the letter was binding on no one

because Michael Gordon did not physically sign it is meritless.   A binding

contract can be formed by the exchange of unsigned offer and acceptance by

email as long as the writings indicate that the parties intend to be bound without

further formal documentation.  <u>Hostcentric Technologies, Inc. v. Republic</u>

<u>Thunderbolt, LLC</u>, 2005 WL 1377853 (SDNY 2005).  Here, the letter from

Gordon which was signed by defendants clearly indicates that it was to be

binding on both parties if signed and returned by borrowers.  The last paragraph

of the letter states:

> Please indicate your acceptance of this Commitment by signing
> below and returning this letter... If we have not received your
> signed acceptance and deposit check by 5pm on February 23,
> 2007, time being of the essence, this commitment shall expire and
> be of no force and effect.

Gordon Aff. Exh. 2 p.5.  Moreover, it is undisputed that SSP performed under the

commitment letter, which further supports that it intended to be bound by the

letter.  <u>Hostcentric</u>.

 Second, the commitment letter clearly states that defendants agreed to be

bound to close the transaction.  The letter required a $10,000 deposit from

borrower, which was paid, and stated with respect to such deposit:

> [I]n the event Borrower fails to close as required by this
> Commitment after acceptance of the Commitment by Borrower, this

deposit shall be forfeited to Lender.  Such forfeiture shall not limit
Lender's remedies in the event of Borrower's default hereunder.

Id. p. 3.  Therefore, the Court should find that the commitment letter is a bilateral

contract as a matter of law based on the plain language of the agreement.

B.    Plaintiff Performed Under the Agreement

It is undisputed that plaintiff prepared to close and was ready to loan the

funds provided that defendants completed the tasks necessary to close.  Gordon

Aff. ¶ 11, Gordon Aff. Exh.7.

C.    Defendants Breached the Agreement

It is undisputed that defendants refused to proceed to a closing.  Gordon

Aff. ¶ 12.

D.    SSP Has Been Damaged

SSP suffered two categories of damages.  The first is completely

straightforward.  It lost the $132,000 loan origination fee that would have been

paid at closing.  Gordon Aff. ¶ 13; Gordon Aff. Exh. 2.

Second, SSP lost $105,000 in profits it would have made from the one-

year loan.  Gordon Aff. ¶¶ 14-15.  Although SSP had an obligation to seek to

mitigate by making another loan, it was unable to do so because it did not have a

suitable loan to invest in.  Id. ¶ 16.  Moreover, the fact that the loan did not have

a prepayment penalty and could have been prepaid within the year term does not

defeat SSP's claim.  First, SSP concedes that $1,200,000 would have been

prepaid due to the sale of 72-84 East 111th Street, and only seeks lost profits with

respect to $1,000,000 of the loan.  Second, prepayment should not be assumed.

In Pipkin v. Thomas & Hill, Inc., 298 N.C. 278, 258 S.E.2d 778, 785 (1979), the

North Carolina Supreme Court held that the trial court erred in discounting an award based on the probability of prepayment. Cf. Lincoln National, 603 F.Supp. at 1408 (holding that possibility of prepayment should be considered in calculating damages for 25-year loan where plaintiff's data showed average life of such loans was substantially less that 25 years).

Conclusion

For the foregoing reasons, the Court should grant SSP summary judgment against defendants and award it damages of $237,000.

Dated: August 11, 2008

Respectfully submitted,

Richard C. Yeskoo (RY7329)

8