UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SSP CAPITAL PARTNERS, LLC,                    Case No.: 07 CV 3878 (NRB)

                    Plaintiff,

        -against-

MANDALA LLC, HAROUST, LLC,
HAMILTON GRANGE, LLC, ARABARA, LLC
and 316 SECOND AVENUE, LLC,

                    Defendants.
----------------------------------X

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

I.    <u>PRELIMINARY STATEMENT</u>

        There are numerous issues of fact in this case which bar
summary judgment, as well as matters of law not considered in
Plaintiff's motion which make summary judgment untenable,
such as whether the very contract sued upon was ever validly
formed, whether it was ever breached, and whether the relief
sought by Plaintiff is cognizable at law.

        As will be shown, no valid contract was ever formed for
two reasons. First, the contract required as a condition
precedent to formation that on a date certain, a certain
downpayment deposit be made, barring which the purported
contract mandates that it "shall expire and be of no force
and effect." That downpayment was never made. Second, the
subject loan commitment, one for a mortgage on real property,
is subject to the statute of frauds set forth in New York
General Obligations Law § 5-703, which requires that it be

signed. The loan commitment was never signed by any representative of Plaintiff.

As will further be shown, even if a valid contract was held to be formed, it was not breached even under the facts alleged by Plaintiff, because Defendants were not required to borrow the funds, which is an underlying and threshold assumption that Plaintiff does not address.

Moreover, even if a breach of contract can be made out, Plaintiff's damages are limited to its costs in the action—expenses such as reasonable legal fees expended; due diligence costs; fees for document preparation in contemplation of a closing, and the like—Plaintiff's request for loss of profits (a loan origination fee of $132,000. and $105,000 in unrealized and speculative interest it "would" have garnered if the loan had closed), is the wrong measure of damages.

Finally, it will be also be shown that, even if, *arguendo*, a valid contract was formed, and Defendants were required to borrow, and Plaintiff can recover lost profits, Plaintiff's allegations of a breach is built on a foundation of sharply disputed *facts*, opposed by admissible testimony, thus rendering summary judgment unattainable.

## II.  STATEMENT OF FACTS

The Court is respectfully referred to the affidavit of Haroutiun Derderian, a principal of each of the Defendants, executed on September 9, 2008 (the "Derderian Affidavit"), the exhibits attached thereto and hereto including deposition testimony transcript excerpts, and Defendants' accompanying Statement of Contested and Uncontested Facts for a complete

recitation of the facts, which will not be repeated herein at length.

## ARGUMENT

### III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"In determining whether there are genuine issues of material fact that preclude judgment... as a matter of law, we must resolve all ambiguities in favor of the nonmoving parties... The Court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty America* v. *Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004) (internal citations omitted). *See also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2511 (1986) ("it is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

Thus, while the parties' testimony may portray radically different versions of the facts relating to the parties' course of dealing, in considering both the documentary evidence submitted by the parties, as well as the affidavits

in favor and in opposition to the motion, and the deposition transcripts offered herewith, the Court need not determine which party's version is more credible; it need only determine that Defendants' evidence is credible enough to warrant a trial on the material issues. See *OT Africa Line, Ltd v. First Class Shipping Corp.*, 124 F. Supp.2d 817, 820 (S.D.N.Y 2000) ("On a motion for summary judgment, a court 'cannot try issues of fact; it can only determine whether there are issues to be tried"') (internal citation omitted).

## IV.  NO CONTRACT WAS EVER FORMED

### A.    No Deposit Was Sent

The subject writing sued upon and referred to by reference in Plaintiff's complaint is dated February 22, 2007 (Exhibit "C"),[1] was created by Plaintiff and signed by Defendants, and is called internally a "commitment" (hereafter, the "February Writing").

Underlying Plaintiff's motion and not addressed by Plaintiff at all therein is Defendants' affirmative defense set forth in its answer,[2] that the February Writing was never validly formed as a contract between the parties.

In the absence of a valid contract, perforce, Plaintiff's suit cannot succeed and summary judgment cannot be granted as Plaintiff's claims depend entirely on enforcement of the alleged meaning and effect of the February

---

[1] Prior proposed commitment letters dated December 5, 2006 and December 21, 2006 are annexed respectively at Exhibits "B" and "C".

[2] Appearing at docket entry 8; no pleadings were attached to Plaintiff's motion for summary judgment.

Writing's terms and breaches thereof.

The February Writing states unequivocally:

> If we have not received your signed
> acceptance of this commitment and deposit
> check by 5pm on February 23, 2007, time
> being of the essence, this Commitment
> shall expire and be of no force and
> effect.

The deposit check referred to in this clause is defined in a previous section under the heading "Borrower's deposit", which calls for a deposit of $10,000, which deposit amount is specifically defined as being in addition to a previous deposit of $10,000.

This language is plain and unambiguous. If the deposit check was not received on February 23, 2007 by 5 p.m., the contract expired and was without force and effect.

The said condition precedent deposit check was never sent by any Defendant to Plaintiff. Plaintiff has put in no evidence that such deposit check was delivered to it, and the Derderian Affidavit avers that no such deposit payment was made, which sworn statement by the party opposing summary judgment must be taken as true. *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2nd cir 2004) citing to *Samuels v. Mockry*, 77 F.3d 34 (2nd cir 1996) ("The non-movants... 'will have [their] allegations taken as true, and will receive the benefit of the doubt when [their] assertions conflict with those of the movant.'").

"Where... a contract is unambiguous, it is enforced according to its terms, and the court will generally not look "outside the four corners of the document" to add to or vary

- 5 -

it. Where... the contract's language admits of only one reasonable interpretation, the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning. Unambiguous contract terms "are given their plain meaning." *Rosenblatt v. Christie, Manson & Woods Ltd.*, 195 Fed. Appx. 11 (2nd cir., 2006) (internal citation omitted).

Moreover, even if the plain language is held to be ambiguous, since the February Writing was drafted by the Plaintiff, it must be construed against the Plaintiff under the doctrine of *contra proferentem*. Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152 (2nd Cir. 2003); Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 68 (2nd Cir. 2000) ("in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it"); Reefer & Gen. Shipping Co. v. Great White Fleet, 1997 U.S. App. LEXIS 2709 (2nd Cir. 1997) ("The rule of contra proferentem is that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter").

Based on the foregoing, by its plain terms, the February Writing "expired" and was "without force and effect" as of midnight on February 23, 2007. Accordingly, summary judgment cannot be granted to Plaintiff as the contract it sued upon is a nullity.

Plaintiff has claimed, at least by implication, that despite the language at the end of the February Writing requiring a deposit to be sent, that the "Borrower Deposit" clause in the February Writing actually refers to the

*previous deposit*, not to *additional funds*, so no additional
funds needed to be sent.

This (implicit) theory is illogical. The language that
was in the prior proposed loan commitment letter of December
21, 2006, which required a deposit be sent, was modified, to
speak of both the previous $10,000 deposit "in addition to
the $10,000 provided for...".

Likewise, the clause at the end of the February Writing
requiring a check to be sent by 5 p.m. of the day after the
contract was dated becomes pure surplusage if no additional
deposit was required. Since the Plaintiff drafted the
document and put in this clause requiring payment by a
specific time on the day after the February Writing was
dated, it makes no sense for them to have inserted this very
specific language for no purpose.

In interpreting such matters, the canon of construction
respected by the Court is that no instrument should be
construed to render any of its words as surplusage. See,
e.g., United States v. Percheman, 32 U.S. 51 (1833) ("It is
one of the admitted rules of construction that
interpretations which lead to an absurdity, or render an Act
null, are to be avoided").

Plaintiff must be seen to have intended what they wrote
to be granted its plain meaning, and it must be held against
them as the drafters of the writing. *Rosenblatt,* Reefer, *id.*

In the event, however, that this Court were to hold that
the "Borrower Deposit" clause renders the February Writing
ambiguous on the issue of whether an additional deposit was

required, then parole evidence comes in, one form of which is the sworn statements made by Mr. Derderian in his affidavit.

On this motion, Mr. Derderian avers in his affidavit that Michael Gordon of the Plaintiff called him and demanded this additional amount be sent to the Plaintiff and that if such additional deposit was not sent, Plaintiff would not make the loan to Defendants. (Derderian Affidavit at ¶21).

In any event, when the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment." Leon v. Lukash, 121 A.D.2d 693 (2nd Dept. 1986).

Accordingly, if the subject clauses of the February Writing framed here are unambiguous, summary judgment cannot be granted (*and would be warranted to Defendants*)[3] and if they are ambiguous, summary judgment likewise cannot be granted.

**B.    The February Writing Was Not Signed By Plaintiff**

An additional defect in the February writing is that it is entirely unsigned by the Plaintiff. Plaintiff alleges in the affidavit of its representative, Michael Gordon, (at ¶6) that "although I did not sign the commitment letter because it was transmitted by email, SSP intended to be bound by the letter when duly accepted by Defendants. This intention is plain from the language of the cover E-mail and the commitment letter."

---

[3] This Court is warranted to grant summary judgment to the non-moving part if it deems it appropriate. See, e.g., *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2nd Cir. 1999); *McMahon v. Providence Capitol Enters., Inc.*, 235 B.R. 527, 538 (SDNY 1998).

- 8 -

The fact that Plaintiff "intended to be bound" without signing cannot affect the statutory requirement that an agreement affecting real property is required to be in writing and signed by the person seeking to have the writing enforced pursuant to the relevant statute of frauds.

Under General Obligations Law § 5-703, "An estate or interest in real property, other than a lease for a term not exceeding one year, or any trust or power, over or concerning real property, or in any manner relating thereto, cannot be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same, or by his lawful agent, thereunto authorized by writing."

The statute's use of the word subscribed has been held to mean signed.

The loan commitments, unsigned by Plaintiff, are proposals to enter into a mortgage. If they had been effectively accepted by both sides and had closed, the loan from Plaintiff would have been secured in Defendants' real property.

As such, the proposed loan commitments are patently within the ambit of an "interest in real property... or any trust or power, over or concerning real property, or in any manner relating thereto". See e.g. *Sleeth v. Sampson*, 237 N.Y. 69 (1923) ("A mortgage is a conveyance of an interest in real property within the meaning of section 242)[4]; *Huntington*

---

[4] G.O.L § 5-703's predecessor statute, Real Prop. Law [Cons. Laws, ch. 50], § 242, 259, which contain almost identical language.

*Towers, Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863 (2nd Cir 1977) ("a contract to give a mortgage is a contract for the sale of an interest in real property" and thus governed by the Statute of Frauds).

The February Writing thus falls squarely within the statute of frauds, and could not have been created, granted, assigned, surrendered or declared, without being "subscribed", pursuant to G.O.L. § 5-703.

Plaintiff cites cases such as *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, 2005 U.S. Dist. LEXIS 11130 for the proposition that if an intent to be bound can be found, a valid and binding contract can be formed even without a formal writing.

This is a general proposition that does not overrule the language of the proposed contract here, which required the condition precedent, by its terms, of an additional deposit or the contract expires.

Likewise, such general rule does not and cannot overrule the requirement that in particular types of cases, the statute of frauds requires more. As already shown, where the contract involves real property, G.O.L. § 5-703 requires that the contract to be in writing and that it be signed. An intent to be bound, even if it could be found here, is irrelevant in such circumstances.

### V.    NO BREACH OCCURRED BECAUSE DEFENDANTS WERE NOT REQUIRED TO BORROW ANY FUNDS

In order for Plaintiff to properly claim damages for breach of contract, it must first show that a breach actually occurred.

An underlying but never addressed assumption in Plaintiff's motion, is that by *failing to borrow*, the contract was breached.

The February Writing is a purported commitment by Plaintiff to loan funds. Its terms are directed at the duties and rights of the parties upon a loan closing—the terms of the loan, and related matters—but the February Writing contains no language requiring Defendants to borrow, and Defendants did not, in fact, borrow any funds from Plaintiff.

It is Defendants' position that since no loan was made, and they were not required to borrow, even if the facts as stated by the Plaintiff were true, Defendants could not have breached the contract, which was by its nature executory until a closing occurred as a condition precedent to a breach.

The closest language that could possibly be interpreted to at least refer to an obligation to borrow, is stated in the "Borrower Deposit" clause, which states in pertinent part:

> ...or in the event Borrower fails to close as required by this Commitment after acceptance of the Commitment by Borrower...

- 11 -

This language is referential. It is not an obligation to close in and of itself, but a reference to a (non-existent) requirement somewhere else in the commitment that purportedly makes closing a requirement. No other such section actually exists.

This issue of an obligation to borrow, *vel non*, was previously briefed by the parties in pre-motion correspondence on a proposed (but ultimately never made) pre-answer 12(b)(6) motion focused on whether the amount in controversy met the $75,000 threshold for diversity jurisdiction purposes. The Plaintiff in opposition to that prior proposed motion cited a number of cases, which are discussed hereafter.

In each such case discussed below, and in stark contrast and distinction to the "commitment" at issue herein, the loan commitments contained express promises by the borrower to borrow the funds committed.

In *Resource Mortg. Banking v. Turley*, 233 A.D.2d 308 (2nd Dept. 1996), the decision reveals that the lender was to earn $50,000 in fees, of which the borrower had paid $22,000. When the loan failed to close, the borrower demanded return of the $22,000 and the lender sued for the remainder of the promised fee. The Court below dismissed the lender's action, and the Appellate Division reversed stating that pursuant to the commitment letter, the lender earned its fee upon the borrower's execution of the commitment letter.

Upon reviewing the record on appeal in *Turley*, it was learned that the commitment at issue there contained an express promise to borrow, stating in pertinent part:

- 12 -

> You ... accept this offer to lend and
> agree to close the loan and to borrow from
> RMB and/or its investor according to said
> terms and conditions.

An examination of the commitment letter at issue here reveals that it contains no such obligation on the part of the borrower. There is simply no promise to borrow evident from the commitment——just a promise to lend.

In *Teachers Insurance & Annuity Association of America v. Coaxial Communications of Central Ohio, Inc.*, 807 F.Supp 1155 (SDNY 1992), the District Court denied the defendants' motion for partial summary judgment, finding that there was a binding agreement between the parties to lend *and to borrow*.

The decision itself, states that "This case involves alleged breach by defendant ("Coaxial") of a commitment letter binding it to borrow...."

Upon pulling the case from the Federal Archives, it was learned that the commitment at issue in *Coaxial* is very different from the commitment in the case at bar. The *Coaxial* commitment, at its last paragraph, reveals both a promise (on behalf of the lender) to purchase the notes, and a promise (on behalf of the borrower) to "issue, sell and deliver" the notes.

There is no similar binding language requiring borrowing in the commitment letter herein at issue, including in the referential language cited previously from the "Borrower Deposit" clause.

A review of the underlying file in *Teachers Insurance & Annuity Association of America v. Ormesa Geothermal*, 791

F.Supp 401 (SDNY 1991) reveals an almost identical set of lending documents as in the Coaxial case.

The relevant commitment letters in *Turley*,[5] *Coaxial* and *Geothermal*, each showing an obligation to borrow, are annexed respectively at Exhibits "F", "G" and "H".

Thus, the law on contracts is unavoidable. Before damages on account of an alleged breach are assessable, there must be a finding that there was an obligation undertaken which was breached.

Where, as here, the borrower never undertook any obligation to borrow, and the commitment letter evidences no such obligation, the February Writing cannot be rewritten to bind the Plaintiff to borrow where it is not contemplated in the contract. Thus, no breach could have occurred prior to Defendants borrowing the contemplated funds from Plaintiff. Since that eventuality never came into existence, no breach of contract ever occurred.

Regardless, where there are reasonable, competing interpretations of a contract, a question of fact is presented, which precludes summary adjudication. See, e.g., Dermot Co., Inc. v. 200 Haven Co., 2007 NY Slip Op 5305 (1st Dept. 2007).

---

[5] This poor quality copy is the best available from microfilm.

VI.    **EVEN IF A BREACH OF CONTRACT CAN BE MADE OUT, PLAINTIFF IS NOT ENTITLED TO LOSS OF PROFITS; COSTS ARE THE ONLY PROPER MEASURE OF DAMAGES**

A.    **Recovery For Loss of Profits Does Not Appear in, and cannot Fairly be Said to be Implied by, the Language of the February Writing**

The only recovery specifically made available to the Plaintiff under the February Writing is stated at a clause under the heading "Costs", which is expressly made enforceable whether the loan "closes or not":

> All costs to Lender in respect of the Original Loan Commitment and all costs associated with this transaction including, without limitation, Lender's legal expenses, will be paid by the Borrower, whether or not the loan transaction contemplated hereunder closes or not.

Plaintiff in this suit has sued not for costs, but for the alleged lost profit of not realizing a loan origination fee of $132,000, which was "to be paid at a loan closing,"[6] and for other, speculative profits it alleges it would have recovered if the transaction had closed.

A section of the February Writing the Plaintiff quotes in its memorandum of law at first glance appears to allow other claims (although by no means specifically for lost profits).

Appearing in the "Borrower's Deposit" clause of the

---

[6] See clause denominated "Loan Origination Fee".

February writing, after the previously discussed setting of a deposit and additional deposit, the section provides for forfeiture of the deposit under certain circumstances not relevant as they have prerequisites of failing to close (as previously addressed the February Writing doesn't actually have this section) and acceptance of the loan (Defendants never sent the additional deposit so they could not have accepted), but goes on to say that:

> Such forfeiture shall not limit Lender's remedies in the event of Borrower's default hereunder.

The question them becomes, what is meant by a "default hereunder" in this excerpted language.

This language is certainly not pointed—there is no definition of "default" in the February writing—but it resolves on some of the same issues that have been discussed previously.

Fundamentally, if no binding contract was ever formed, either because of the lack of Plaintiff's signature or because no additional deposit was ever sent (both discussed previously at length), then this clause is moot.

Similarly, if the commitment does not require an obligation to borrow, and if there could be no breach without such obligation, then there could be no "default" to invoke.

However, it appears that Plaintiff's claim rests in part on the implied covenant in every contract of good faith and fair dealing. Plaintiff spends much of its writing effort in exclaiming that Mr. Derderian did not make a good faith effort to seek to close the subject loan.

These statement are directly contradicted by the testimony of Mr. Derderian averring that it was the Plaintiff's failure and bad faith that caused the loan not to close (in addition to matters such as Plaintiff's failure to schedule a time of the essence closing date, or a closing date at all). Thus, this is exquisitely a question of fact that cannot be determined on summary judgment.

In any event, even if this court were to find that the February Writing does not limit the plaintiff's damages to costs, Plaintiff's claim for lost profits does not meet the test established under New York law for their recovery.

**B.    Plaintiff's Claim For Lost Profits Does Not Meet the Three Part Test Established Under New York Law**

"Under New York law, loss of future profits which would have been earned but for the breach of contract are recoverable, provided they satisfy three criteria. First, it must be demonstrated with certainty that such damages have been caused by the breach... second, the alleged loss must be capable of proof with reasonable certainty [and] third, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 432 (S.D.N.Y. 2004), citing to the New York Court of Appeals decision in *Kenford Co. v. County of Erie*, 67 N.Y.2d 257 (1986) (hereafter "Kenford I").

As to the first prong announced above requiring a showing with certainty that the damages flow directly from the alleged breach, even if Defendants were required to borrow, there are sharply disputed issues of fact, as will

be demonstrated in subsequent sections herein, as to the allegations Plaintiff alleges constitute Defendants' breach. Based on this alone, summary judgment is inappropriate.

With respect to the second prong requiring a showing of loss with reasonable certainty, it is conceded that the loan original fee is the sum-certain amount of $132,000, and thus that portion of lost profits, if recoverable at all, is reasonably certain.

However, Plaintiff also seeks $105,000. based on that Defendants "would have almost immediately repaid $1,200,000" on the 2.2 million dollar loan. Building on this, Plaintiff limits the amount sought to interest on the remaining 1 million dollars over 1 year. It then calculates a rate of interest to charge on that amount and over that time period as 10.5%, stating that this rate is based on that the loan called for 14.5% interest rate, and that the money Plaintiff would have loaned instead remained in Plaintiff's bank earning 4% or less interest, so the lost profit is at least the difference between its bank account rate of interest and the interest on the loan (14.5% – 4% = 10.5%; 10.5% x $1,000,000 = $105,000).

This second "lost profit" amount of $105,000. is sheer speculation. Defendants could have immediately paid off the *entirety of the loan*, which would result in Plaintiff having earned no interest whatever on the principal.[7] Likewise, Plaintiff could have made any number of alternate investments or security purchases with the

---

[7] In fact, the "commitment" expressly states that there is no pre-payment penalty, which many lenders put in to ensure profit.

- 18 -

money which would yield it a higher rate of interest or
return—even a yield above what is speculates it would have
profited.

Even more to the point, this is sought based on
Plaintiff's allegations that it was not able to loan the
funds to another party. Yet, Plaintiff has put in no proof
that its funds were limited such that these particular
funds, earmarked for this deal alone, foreclosed other
deals, nor have they shown that they reasonably searched
for another deal to defray these "lost profits".

"The [lost profit] damages may not be merely
speculative, possible or imaginary, but must be reasonably
certain and directly traceable to the breach, not remote
or the result of other intervening causes." *Kenford I at
261.* Not having other loans to make is squarely an
"intervening cause."

This second class of "lost profits" cannot, thus, be
shown to meet the second prong for lost profit recovery
requiring a showing of what "would have been earned but
for the breach of contract." Such precise standard cannot
be fulfilled by surmise about what might have happened.
This is especially true where Defendants could (just as
speculatively) have taken action that would make the
contemplated profits reduce to $0.0 or a *de minimis*
amount, simply by paying back the loan early, if a loan
had ever been made.

The third prong of the announced test Plaintiff also
cannot satisfy for *any* of the alleged lost profits sought.
There has been no "showing that the particular damages

were fairly within the contemplation of the parties to the contract at the time it was made."

Indeed, Plaintiff did not even address the subject in its motion. Certainly, the February Writing is silent on the issue of lost profits. Moreover, the silence on this issue is far more telling when it is considered that the February Writing does contain a clause specifically providing a pecuniary remedy of costs only, that is specifically addressed to whether the loan "closes or not."

Plaintiff has not and cannot show that lost profits were specifically contemplated between the parties at the time the February Writing was made, and they have not even attempted to do so.

"Most of the leading cases which have decided on claims of future lost profits have ruled that they are not recoverable." *Great Earth*, *at 432*. The two "leading cases" the Great Earth court relied on are *Kenford I* (supra), and *Kenford Co. v. County of Erie*, 73 N.Y.2d 312 (1989) (hereafter "*Kenford II*").

The Kenford cases involved a contract between the Kenford Company and Erie County to build a domed stadium for the Buffalo Bills. Ancillary to that contract was another agreement authorizing Kenford to manage the stadium for twenty years. In *Kenford I*, plaintiffs sued for the lost profits that they alleged they would have earned from the management contract. In *Kenford II*, Kenford sued for loss of profits stemming from the alleged lost appreciation of real estate located in the stadium's vicinity. Both times, the Court of Appeals denied the

- 20 -

claims for lost profits, holding in part that the evidence
did not demonstrate that the parties had contemplated such
claims at the time they signed the contract.

Kenford I charted a course for courts to follow in
determining whether the parties had contemplated recovery
for lost profits. First, Kenford I looked at the contract
itself to see if any provision discussed such a remedy. In
the instant case, the contract is silent.

Where the contract is silent, Kenford 1 announced
that "the commonsense rule to apply is to consider what
the parties would have concluded had they considered the
subject." Kenford II followed this course, noting that the
commonsense approach includes consideration of "the
nature, purpose and particular circumstances of the
contract known by the parties... as well as 'what
liability the defendant fairly may be supposed to have
assumed consciously, or to have warranted the plaintiff
reasonably to suppose that it assumed, when the contract
was made.'"

In this case, the contract calls for a loan
origination fee upon closing. It is not reasonable for the
Plaintiff to have expected to be paid that fee if no loan
was made and no closing held.

It is even less reasonable for the Plaintiff to have
expected the Defendants to contemplate, following no
closing, to have to pay a year's interest at the contract
rate less the rate of interest the Plaintiff's money might
be expected to be earning in the bank, in the event
Plaintiff was unable to find another person to loan its

funds to, which Plaintiff further has not shown it made
efforts to procure to defray such "lost profits".

Defendants had no idea of the amount of Plaintiff's
financial holdings, where it kept its money, what it was
invested in and so on, in order that they could even
logically consider such notions.

Nothing in the particular circumstances of the
contract between the parties raises the specter of lost
profits. It simply was not discussed, was apparently not
considered by the Plaintiff when it drafted the contract,
and was certainly not considered by the Defendants, who
were shocked to realize they were being sued for what
appeared to them to be outlandish fees for monies patently
not earned.

Mr. Derderian directly addresses these issues in his
affidavit, stating in pertinent part that: "No provision
for lost profits was ever discussed by me with any
representative of the Plaintiff, nor mentioned to me
either orally or in writing by Plaintiff. lost profits
were not contemplated between the parties at all." (¶33),
and "I would never have agreed to obligate any Defendant
to pay any sum for lost profits if the loan did not close,
much less the vast sums the Plaintiff seeks." (¶34).

Finally, *Kenford I and II* and other cases have also
made clear that the parties seeking lost profits, have the
burden of proof on this issue. Great Lakes *at 433*.

Thus, it is Plaintiff's burden to show that it meets
all three prongs of the Kenford test, including on the
third prong that the parties would have concluded that

lost profits were recoverable in the manner Plaintiff particularly alleges, had the parties considered the subject in the February writing.

Yet, Plaintiff has not even addressed the issue and Mr. Derderian categorically denies such lost profits were contemplated between the parties or that he would have agreed to them if they were discussed. For these reasons, summary judgment should be denied.

### VII. THE BREACH THAT IS ALLEGED BY PLAINTIFF REST ON NUMEROUS ISSUES OF FACT INAPPROPRIATE FOR SUMMARY DETERMINATION

Plaintiff's counsel characterizes the acts of the Defendants as amounting to a breach of contract as a matter of law. Yet he relies on numerous facts to reach that conclusion.

The Derderian Affidavit submitted herewith paints a very different version of events than those submitted by Plaintiff. As previously cited, the law requires statement by a party with knowledge submitted in opposition to summary judgment to be granted every favorable inference and his statements to treated as true as the party opposing summary judgment. *Dawson*, *supra.*

Accordingly, the only way summary judgment could be granted is if this Court were to find that despite the truth of the statements in the Derderian affidavit, none of these matters rest on issues of fact.

Contrary to Plaintiff's counsel's fundamental assertion, Richard Kaplin, Esq., the attorney asserted to be Defendant's counsel, was never actually hired. This is stated by Mr.

Kaplin at page 7 of his deposition testimony, which is annexed at Exhibit "D".

Additionally, according to the deposition testimony of Plaintiff's transaction attorney, 1) no transmittal of closing documents was ever given directly to any Defendant; 2) such closing documents only <u>may</u> have been sent to Mr. Kaplin as purported attorney for Defendants, and 3) no closing date was ever set by Plaintiff, at all.

Annexed hereto as Exhibit "I" are pages 13 and 19-20 of Mr. Rubin's deposition transcript verifying these facts.

Plaintiff has, thus, not even asserted that a time of the essence closing date was ever set. Yet, where no law date is set for closing, both sides are deemed to have a reasonable time to close. See, e.g., <u>Resource Mortg. Banking v. Turley</u>, 233 A.D.2d 308 (2nd Dept. 1996). What was reasonable, under the circumstances, and whether either side should be blamed for the non-closing of the contract is manifestly a question of fact, which precludes summary determination.

Furthermore, at no time did Defendants ever say that they did not want to borrow monies from the Plaintiff. In fact, Mr. Derderian sent a letter on <u>April 16, 2007</u> (Exhibit "E")—that is, almost two months after the February Writing—still seeking to procure a loan on Defendants' behalf. Defendants were, at all times, ready, willing and able to borrow. Any assertion to the contrary is simply untrue, and is disputed on the basis of Mr. Derderian's admissible testimony (see the Derderian Affidavit at ¶46).

Anther issue is raised by the sale of the property located at 72-84 East 111th Street twenty-three days after the date of the February Writing. The timing is significant.

Though the February Writing provided for a release of certain collateral after the mortgage was made, once that property was sold, and Plaintiff at all times knew that the sale was imminent, that property was no longer able to be included in the initial basket of collateral. Thus, the question of whether performance *was impossible*, is a factual determination based upon the timing of other occurrences and the failure of either party to set a firm closing date.

Accordingly, to the extent that summary dismissal of the action against Plaintiff would not be warranted on the issues set forth in previous points, issues of fact predominate in this matter and no summary adjudication would be proper.

## VIII.    <u>CONCLUSION</u>

For the reasons stated herein, the sworn statements set forth in the Affidavit of Defendants' principal, Haroutiun Derderian, the issues raised in the accompanying Statement of Contested and Uncontested Facts, and in the exhibits annexed hereto, it is respectfully asserted that, to the extent a contract can be said to have ever been formed, and a breach of that contract can be made out, every basis Plaintiff relies on in support of a grant of summary award invokes multiple issues of fact which render summary judgment insupportable.

WHEREFORE, it is respectfully requested that Plaintiff's motion for summary judgment be denied in all respects, and

for such other and further relief as to this Court may seem just and proper.


Dated:      Brooklyn, New York
            September 10, 2008          Respectfully submitted,

                                        s/ Michael T Sucher, Esq.
                                        MICHAEL T. SUCHER, ESQ.
                                        Attorney for all Defendants
                                        26 Court Street, Suite 2412
                                        Brooklyn, New York 11242
                                        Tel: (718) 522-1995
                                        Fax: (718)797-3174