```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
SSP CAPITAL PARTNERS, LLC,              Case No.: 07 CV 3878 (NRB)

                Plaintiff,

        -against-                       AFFIDAVIT IN OPPOSITION
                                        TO PLAINTIFF'S MOTION
MANDALA LLC, HAROUST, LLC,              FOR SUMMARY JUDGMENT
HAMILTON GRANGE, LLC, ARABARA, LLC
and 316 SECOND AVENUE, LLC,

                Defendants.
------------------------------------X
STATE OF NEW YORK   )
COUNTY OF KINGS     ) ss.:
```

HAROUTIUN DERDERIAN, being duly sworn, deposes and says:

1. I am a principal of each of the Defendants in the within action, and as such, I am fully familiar with the facts and circumstances set forth hereafter.

2. I submit this affidavit in opposition to Plaintiff, SSP CAPITAL PARTNERS, LLC's ("SSP") motion for summary judgment dated August 11, 2008.

3. The Defendants are (and in some cases, were) owners of a number of parcels of real property relevant in this action, all located in Manhattan.

4. Specifically, MANDALA LLC owned 29 West 26th Street[1] and owns 230 East 27th Street; HAROUST, LLC owns 116-122 East 124th Street; HAMILTON GRANGE, LLC owns 605 West 141st Street; ARABARA, LLC owned 72-84 East 111th Street (sold as of March 16, 2007); and 316 SECOND AVENUE, LLC owns 316 Second Avenue.

---

[1] Deeded to Arabara LLC on November 9, 2007.

5.  In 2006 a number of Defendants' properties had fallen into default with their mortgages and some were in foreclosure. I accordingly began searching for a loan for the purpose of reinstatement and/or payoff.

6.  In or about late 2006, I met Michael Gordon when a school he is involved with wanted to rent some space from a property owned by Haroust, LLC. Later, upon learning that he was involved with SSP and that that company was in the business of providing financing, we discussed a loan from SSP to the Defendants.

7.  From early in our negotiations, the Plaintiff was aware that Defendants were attempting to sell the 72-84 East 111th Street property, and that should that sale go forward, the total amount Defendants would need to borrow would be reduced.

8.  A number of drafts of proposed loan commitment agreements were prepared by Plaintiff and transmitted to me as representative of the Defendants. An initial form of loan commitment was sent on or about December 5, 2006. I attach a copy hereto as Exhibit "A". Under that version of the loan commitment, the amount of the loan was to be $550,000.

9.  On December 21, 2006 a second proposed loan commitment was sent to me as representative of the Defendants, which my wife and I signed as guarantors. I attach a copy hereto as Exhibit "B". The December 21, 2006 commitment, among other changes to the prior proposed

commitment of December 5, 2006, raised the loan amount to $800,000.

10.  As the December 21, 2006 commitment required a $10,000 deposit to secure the loan commitment, I transmitted that amount to the Plaintiff. The December 21, 2006 commitment was never signed by the Plaintiff, and never closed.

11.  It was my understanding that the $10,000 deposit made in connection with the December 21, 2006 commitment was to cover SSP's costs and legal fees for its efforts and costs in bringing that loan transaction to fruition.

12.  I always understood that the extent of my risk in signing the December 21, 2006 commitment was $10,000, in the event that the loan didn't close.

13.  Over the next few weeks I sent Plaintiff many documents including payoff letters, mortgage documents, tax returns and the like—documents it needed to prepare for a closing. No closing could go forward until all the closing documents were ready.

14.  It was my expectation that once the Plaintiff had all the closing documents in place, it would formalize the December 21, 2006 proposed commitment letter by signing it but it never did. I was anxious to go forward with a closing as the properties were falling ever deeper into default, with fees from foreclosure actions mounting.

15. However, Plaintiff never finished paving the way for a closing. Many weeks passed without any indication that a closing was going to occur.

16. Although I understand that the Plaintiff has claimed in this suit that at some point in time it had a full closing set of documents, and even that a closing was scheduled, I never saw a set of closing documents, and I was never informed that a closing date was set.

17. By February 2007, circumstances had inevitably changed. I asked for a larger loan to cover the Defendant's growing needs, and the Plaintiff's representatives and I renegotiated a new proposed commitment.

18. On or about February 22, 2007, Plaintiff's representatives transmitted to me a proposed new commitment letter. Numerous modifications were made from the most recent version of this letter,

19. I signed the proposal on behalf of Defendants on February 23, 2007 (copy at Exhibit "C") but did not send any additional deposit. I did not want to risk additional deposit monies until the Plaintiff accounted for the $10,000 previously sent, nor bind the Defendants to some of the commitment's objectionable terms. By this point in time, I was very frustrated in that the Plaintiff had delayed and delayed and it still did not appear that a closing was imminent.

20. Most critically, I did not want to commit Defendants to one portion of the loan terms, explained below,

when it appeared that the sale of one of the collateral properties, 72-84 East 111th Street, was going to happen soon, and the amount Defendants needed to borrow would be commensurately reduced.

21. Within a day or two of February 22, 2007, Michael Gordon called me and demanded I send the additional $10,000 required under the February 22, 2007 commitment letter in order for the commitment to be effective. I noted at that time and now, that the said proposed commitment states at its final clause that:

> If we have not received your signed acceptance of this commitment and deposit check by 5pm on February 23, 2007, time being of the essence, this Commitment shall expire and be of no force and effect.

22. My understanding was that based on this language, Defendants would not and could not be bound in any way by the February 22, 2007 proposed commitment letter unless and until the additional deposit required thereunder was made. I thus did not send the additional deposit amount, intending that this would result in the Defendants not being bound in any way.

23. I told Mr. Gordon, among other things, that I did not have any accounting showing what became of the prior $10,000 deposit and that I would not send the funds without that accounting, and furthermore, that I would also not send such funds unless the Plaintiff showed me that a closing was really going to go forward soon. Mr. Gordon responded that if

I did not send the additional deposit, the loan was not going to go forward.

24. I also broached the issue that the proposed loan amount would need to be reduced if the 72-84 East 111th Street property closed, which looked like it was about to happen.

25. The Plaintiff never signed the February 22, 2007 proposed commitment. My understanding was that the commitment could not be a binding agreement unless and until it was returned signed by Plaintiff. As far as I knew, Plaintiff never actually committed to lending any Defendant any money. It appeared that the proposed February 22, 2007 commitment had expired according to its terms when I did not send the additional deposit.

26. Nevertheless, Plaintiff's representatives and I continued discussing the possibility of going ahead with a loan over the following days. One of the main sticking points was one of the conditions listed in the clause entitled "Other Conditions". Language therein required that if 72-84 East 111th Street was sold, I would be entitled to a release of Plaintiff's mortgage upon paying $1,200,000. This was more than half the loan amount and accounted for $72,000 of the six points the Plaintiff was charging on the loan.

27. Since it looked like a closing on that property was about the happen, it made no sense for the Defendants to pay $72,000 extra just to borrow money it did not need. Plaintiff's representative refused to simply reduce the amount of the loan, and delete 72-84 East 111th Street from the collateral "pool".

28. In fact, on March 16, 2007, twenty-three days after the February 22, 2007 loan commitment was sent, the 72-84 East 111th Street property closed, and its mortgage loans were paid off. If, at that time, Defendants were obligated under the February 22, 2007 commitment, they would have effectively paid an astronomical interest rate for use of $1,200,000 for those few short weeks.

29. It is obvious that the Plaintiff admits knowing this loan was going to close. When Plaintiff calculates the $105,000 in interest it seeks, it bases this amount of $1,000,000, rather than $2,200,000, accounting for the fact that the 1.2 million would have been paid almost immediately. See Plaintiff's memorandum of law at page 4.

30. After Michael Gordon and I had the conversation about sending an additional deposit, I believed that no money damages were owed Plaintiff, and that the commitment letters limited Plaintiff's damages to costs (a section of both the December 21, 2006 and February 22, 2007 commitment letters provides for costs only, "whether or not the loan transaction contemplated hereunder closes or not").

31. Plaintiff already had $10,000 to cover costs as a deposit made on the December 21, 2006 commitment, and they had never accounted for how these funds were allocated against costs.

32. I was thereafter shocked to learn Plaintiff was suing the Defendants for an undisclosed sum, but an amount in excess of $75,000. Through my attorney, I later learned that Plaintiff was seeking "lost profits", including the

contemplated loan origination fee under the February 22, 2007 commitment of $132,000 (6% of the $2,200,000 contemplated loan), despite that Plaintiff never lent one penny to the Defendants, and interest of $105,000 Plaintiff calculates it might have earned.

33. No provision for lost profits was ever discussed by me with any representative of the Plaintiff, nor mentioned to me either orally or in writing by Plaintiff. lost profits were not contemplated between the parties at all.

34. I would never have agreed to obligate any Defendant to pay any sum for lost profits if the loan did not close, much less the vast sums the Plaintiff seeks. The loan commitments do not provide for lost profits in the event of a failure to close, and as I noted earlier, the <u>costs</u> clause only provides for undisclosed "damages" if the loan fails to close "as required".

35. My understanding always was, and is, that the commitment never required Defendants to borrow anything.

36. There are a number of facts that Plaintiff alleges that are simply untrue. In Plaintiff's memorandum of law at page 2 it is alleged that the additional deposit contemplated in the February 22, 2008 commitment letter was paid. This is simply untrue.

37. I understand now that the Plaintiff alleges that the deposit clause in the February 22, 2007 commitment refers to the previous deposit, rather than requiring an additional deposit. I only learned of this interpretation during this

litigation, which I know was not the Plaintiff's "interpretation" previously as its representative, Michael Gordon, demanded the second $10,000 deposit from me, which I explicitly told him I would not tender.

38. This is a novel theory in any event, since the language of the clause was modified, the additional deposit was personally demanded from me by Michael Gordon, and the language at the end of the commitment specifically refers to receipt of these additional monies by Plaintiffs by 5 p.m. on February 23, 2007, or the commitment "shall expire and be of no force and effect."

39. Plaintiff also alleges that its representatives prepared all necessary legal documentation and forwarded it to my lawyer (memorandum of law, page 3). Though I did contact an attorney, Richard Kaplin, Esq., to ask him if he would help me close this loan, he was never retained. Mr. Kaplin confirmed in his deposition that he was never actually hired as Defendants' attorney with respect to this contemplated loan.

40. Mr. Kaplin was asked at deposition "were you provided with a set of closing documents for the SSP Loan?" (Page 7). He responded: "I may have been sent an email by the attorney for SSP in connection with a potential closing" (page 7). He further stated that he did not review closing documents for the SSP loan. His deposition is annexed hereto at Exhibit "D".

41. I never saw any proposed closing documents for the loan at issue before suit was filed, and I was never informed

orally or in writing of any closing date at which I had to appear by anyone, nor that a time of the essence closing date had ever been set. It was Plaintiff that was never ready to close.

42. Plaintiff also alleges that at my instruction "Defendants' counsel did nothing" memorandum of law, page 3). Not only did I never instruct Mr. Kaplin in this manner, but Plaintiff has provided no proof that this bald allegation is true.

43. Plaintiff further alleges (memorandum of law, page 4) that on March 9, 2007 a letter was sent to Mr. Kaplin and to me stating Plaintiff was "ready to close provided we cooperated in providing the remaining material needed to close."

44. In this first place, I never saw this letter. Second, it does not even purport to set a closing date. Third, it was the Plaintiff who was never ready to close.

45. Even after I sold 72-84 East 111th Street I was still willing to borrow money from Plaintiff secured by Defendants' remaining properties, but Plaintiff never responded to my request.

46. This can be seen in a letter I sent to the Plaintiff on April 16, 2007, which I annex hereto as Exhibit "E". This letter was followed-up with a conversation with Michael Gordon discussing the matter. He advised that he would get back to me and the next result was this lawsuit.

Defendants were always ready, willing and able to close a loan, just not on the oppressive terms the Plaintiff sought.

47. An example of Plaintiff's fundamental duplicity is the statement in the memorandum of law that I made no good faith efforts to proceed to closing, and that part of this was that I did not procure the agreement of senior lenders to accept payment on the defaulted loans.

48. Not only did I attempt to obtain such agreements, but I informed Plaintiff that the lenders were unwilling to agree to this and that most first mortgagees were unwilling to accept secondary financing. The lenders' actual agreement was outside of my control. I could only make request. It is ironic that the proposed loan commitment letters in this case *themselves* do not allow secondary financing, just as the mortgagees would not. Under the section entitled "other conditions", the loan commitment states: "subordinate liens on the collateral shall not be permitted."

49. This case is a naked attempt by Plaintiff to grab money it has not earned and is not due for a loan it never closed on because of its own failure of due diligence and delay. Summary judgment should be denied.

50. Since I never bound Defendants to borrow any money from Plaintiff, and Defendants never defaulted on any obligation, I cannot see how Defendants are liable to the Plaintiff at all.

WHEREFORE, I respectfully request that Plaintiff's motion for summary judgment be denied in all respects, and for such other and further relief as to this Court may seem just and proper.

HAROUTIUN DERDERIAN

Sworn to before me this
9th day of September, 2008

_____
Notary Public
(affix notary stamp or seal)

MICHAEL T. SUCHER
Notary Public, State of NY
# 24-02 SU 4711475
Qualified in Kings County
Comm. Exp. May 31, 1992
         2010